# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Firearm Owners Against Crime;      :
Kim Stolfer; Joshua First; and      :
Howard Bullock,      :
                 Appellants      :
     :
         v.      :    No. 1434 C.D. 2018
     :    Argued: April 10, 2019
City of Harrisburg      :
Mayor Eric Papenfuse; and      :
Police Chief Thomas Carter      :


**BEFORE:**    **HONORABLE MARY HANNAH LEAVITT, President Judge**
                 **HONORABLE RENÉE COHN JUBELIRER, Judge**
                 **HONORABLE ROBERT SIMPSON, Judge[1]**
                 **HONORABLE P. KEVIN BROBSON, Judge**
                 **HONORABLE PATRICIA A. McCULLOUGH, Judge**
                 **HONORABLE CHRISTINE FIZZANO CANNON, Judge**
                 **HONORABLE ELLEN CEISLER, Judge**


**OPINION BY JUDGE BROBSON**        **FILED: September 12, 2019**


In this appeal from two orders of the Court of Common Pleas of Dauphin County (trial court), we consider two issues. First, we must determine whether any one or more of the named Appellants, plaintiffs below, have standing to challenge the legality of five local ordinances of the City of Harrisburg (City) through a declaratory judgment action. If so, we next must address whether the named individual defendants, Mayor Eric Papenfuse (Mayor Papenfuse) and Police Chief Thomas Carter (Chief Carter), could, by way of preliminary objection, raise the affirmative defense of official immunity.

---

[1] This matter was assigned to the opinion writer before September 1, 2019, when Judge Simpson assumed the status of senior judge.

## I. BACKGROUND

Appellants are Firearm Owners Against Crime (FOAC), Kim Stolfer (Stolfer), Joshua First (First), and Howard Bullock (Bullock) (collectively, Appellants). Appellants filed a complaint on January 16, 2015 (Complaint), seeking declaratory and injunctive relief with respect to the legality of five sections within the Codified Ordinances of Harrisburg (Code). Through 29 separate counts, 473 paragraphs, and 87 pages, Appellants claim that the challenged ordinances unconstitutionally infringe on rights conferred by the Second Amendment to the United States Constitution[2] and Article I, Section 21 of the Pennsylvania Constitution[3] and are preempted by the Pennsylvania Uniform Firearms Act of 1995.[4]

Each of the challenged ordinance sections, or parts thereof, regulate in some fashion the use, possession, ownership, and/or transfer of firearms within the City. Code Section 3-345.1 generally makes it unlawful for unaccompanied minors to possess firearms in the City (Minors Ordinance).[5] Code Section 3-345.2 restricts the discharge of firearms within the City to educational facilities accredited by the

---

[2] The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

[3] Article I, Section 21 of the Pennsylvania Constitution provides: "The right of the citizens to bear arms in defense of themselves and the State shall not be questioned."

[4] 18 Pa. C.S. §§ 6101-6128 (Act).

[5] The Minors Ordinance provides:

It shall be unlawful for any minor under the age of 18 years to have in his or her possession, except in his or her place of residence, any firearm, flobert rifle, air gun, spring gun or any implement which impels with force a metal pellet of any kind, unless said minor is accompanied by an adult.

Code § 3-345.1.

2

Pennsylvania Department of Education and approved by either the Mayor or the Chief of Police or a firing range operation by the Harrisburg Bureau of Police (Discharge Ordinance).[6] Code Section 3.345.4 requires firearms owners to report lost or stolen firearms to law enforcement within 48 hours after discovery of the loss or theft (Lost/Stolen Ordinance).[7] Code Section 3-355.2 prohibits the sale or transfer of firearms and ammunition during the period of emergency declaration by the Mayor and further authorizes the Mayor to prohibit the public possession of firearms during such a state of emergency (State of Emergency Ordinance).[8] Finally, Code

---

[6] The Discharge Ordinance provides:

No person shall fire any cannon, gun, rifle, pistol, toy pistol, or firearms of any kind within the City, except at supervised firing ranges in bona fide educational institutions accredited by the Pennsylvania Department of Education and with the approval of the Mayor or Chief of Police, or at a firing range operated by the Bureau of Police.

Code § 3-345.2.

[7] The Lost/Stolen Ordinance provides:

A. Any person who is the owner of a firearm that is lost or stolen shall report the loss or theft of that firearm to an appropriate local law enforcement official within 48 hours after discovery of the loss or theft[.]

B. For the purpose of this section, the term "firearm" shall be defined as any pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt, or cylinder, whichever is applicable.

Code § 3-345.4.

[8] The State of Emergency Ordinance provides, in relevant part:

A. Whenever the Mayor declares that a state of emergency exists, the following emergency prohibitions shall thereupon be in effect during the period of said emergency and throughout the City:

Section 10-301.13, *inter alia*, prohibits the possession, use, and discharge of firearms within City parks (Park Ordinance).[9]

---

(1) The sale or transfer of possession, with or without consideration, the offering to sell or so transfer and the purchase of any ammunition, guns or other firearms of any size or description.

(2) The displaying by or in any store or shop of any ammunition, guns or other firearms of any size or description.

(3) The possession in a public place of a rifle or shotgun by a person, except a duly authorized law enforcement officer or person in military service acting in an official performance of his or her duty.

B. The Mayor may order and promulgate all or any of the following emergency measures, in whole or in part, with such limitations and conditions as he or she may determine appropriate; any such emergency measures so ordered and promulgated shall thereupon be in effect during the period of said emergency and in the area or areas for which the emergency has been declared:

. . . .

(8) The prohibition of the possession in a public place or park of weapons, including but not limited to firearms, bows and arrows, air rifles, slingshots, knives, razors, blackjacks, billy clubs, or missiles of any kind.

Code § 3-355.2. Although Appellants generally seek relief with respect to the entirety of the State of Emergency Ordinance, including all of subsection (B), we have reproduced only that portion of subsection (B) that relates specifically to firearms, consistent with Appellants' underlying legal theories.

[9] The Park Ordinance provides:

A. No person shall hunt, trap or pursue wildlife in any park at any time, except in connection with bona fide recreational activities and with the approval of the Director by general or special order or rules or regulations.

B. No person shall use, carry or possess firearms of any description, or air rifles, spring guns, bow and arrows, slings or any other form of weapons potentially inimical to wildlife and dangerous to human safety, or any instrument that can be loaded with and fire blank cartridges, or any kind of trapping device in any park.

C. No person shall shoot or propel any object from any of the foregoing into park areas from beyond park boundaries or while in a park.

D. No person shall fish in Italian Lake.

The violation of any of these ordinances could lead to the issuance of a citation and summary criminal proceedings. If cited and convicted, the violator faces a fine of not less than $50 nor more than $1000 per violation, the forfeiture of personal property, and/or imprisonment for not more than 90 days for each violation. Code §§ 1-301.99, 3-345.99, 3-355.99, 3-399, 10-301.99. Because the Code provides for imprisonment upon violation of any of these ordinances, any proceeding to enforce these ordinances will be a criminal proceeding subject to the Pennsylvania Rules of Criminal Procedure. *See Town of McCandless v. Bellisario*, 709 A.2d 379, 380-81 (Pa. 1998).

The named defendants, Mayor Papenfuse, Chief Carter, and the City (collectively, the City Defendants), initially removed the action from the trial court to the United States District Court for the Middle District of Pennsylvania (district court). Thereafter, the City Defendants filed a motion to dismiss the Complaint for, *inter alia*, lack of standing under Federal Rule of Civil Procedure 12(b)(6). The district court, by the Honorable Yvette Kane, granted the motion and dismissed the Complaint, concluding that the district court lacked subject matter jurisdiction over the suit because Appellants lacked standing under federal law[10] to challenge the ordinances. *Firearms Owners Against Crime v. City of Harrisburg*, (M.D. Pa., No. 1:15-cv-0322, filed March 24, 2016, 2016 WL 1162283). Before remanding the matter to the trial court, the district court afforded Appellants an opportunity to amend their Complaint as to certain counts, but Appellants did not avail themselves of that opportunity. Thereafter, the district court remanded the case to the trial court

---

Code § 10-301.13 (footnote omitted).

[10] We are not bound by the district court's standing determination, as Pennsylvania courts are "not bound to adhere to the federal definition of standing." *In re Hickson*, 821 A.2d 1238, 1243 n.5 (Pa. 2003).

5

in accordance with 28 U.S.C. § 1447(c) (requiring remand where district court determines it lacks subject matter jurisdiction over removed action).

Upon remand to the trial court, the City Defendants filed preliminary objections, accompanied by a notice to plead (Preliminary Objections). In their first preliminary objection, the City Defendants sought dismissal of the Complaint for lack of standing under Pennsylvania Rule of Civil Procedure No. 1028(a)(4) (legal insufficiency, or demurrer) or (a)(5) (lack of capacity to sue). In their second preliminary objection, the City Defendants sought dismissal of Appellants' constitutional challenges for failure to state a claim (demurrer), contending that the ordinances do not unconstitutionally infringe on the right to bear arms under the United States or Pennsylvania Constitutions. In their third preliminary objection, the City Defendants sought dismissal of Appellants' preemption challenges for failure to state a claim (demurrer). In their final preliminary objection, the City Defendants sought dismissal of all claims against Mayor Papenfuse and Chief Carter as individuals, arguing, *inter alia*, that both are immune from suit as high public officials.

In response, Appellants filed a single preliminary objection, contending that the City Defendants improperly raised the affirmative defense of official immunity by preliminary objection rather than through an answer to the Complaint under the heading "New Matter," as required by Pennsylvania Rule of Civil Procedure No. 1030. As relief, Appellants asked the trial court to strike paragraph 48 from the City Defendants' Preliminary Objections. By Order dated January 4, 2018, the trial court overruled Appellants' preliminary objection. In doing so, the trial court held that because the City Defendants argued that the immunity defense was clearly applicable on the face of the Complaint, the City Defendants could raise the

6

defense by preliminary objection. The trial court ordered Appellants to answer the City Defendants' Preliminary Objections, which Appellants did on January 23, 2018.

By subsequent Order dated October 9, 2018, the trial court sustained the City Defendants' preliminary objection in the nature of a demurrer and dismissed the Complaint, finding that Appellants failed to plead sufficient facts to establish standing to sue. In an accompanying Memorandum Opinion, the trial court reasoned:

> Plaintiffs have not pled any facts to show that they were harmed by any of the subject Ordinances. Plaintiffs do not allege that they have ever been cited or personally threatened with citation under any of the Ordinances. Rather, Plaintiffs assert potential harm that is entirely speculative, as it is based on events that may never occur. This is an improper use of the Declaratory Judgments [Act].[11] As such, Plaintiffs have failed to allege facts sufficient to establish standing, and this Complaint should be dismissed.

(Trial Court Mem. Op. at 4 (citation omitted).)

## II. DISCUSSION

On appeal to this Court, Appellants argue that the trial court erred in both its January 4, 2018 Order, overruling Appellants' preliminary objection to the City Defendants' Preliminary Objections, and its October 9, 2018 Order, dismissing the Complaint for lack of standing. We review a common pleas court's decision sustaining preliminary objections and dismissing a complaint for an abuse of discretion or error of law. *Brown v. Wetzel*, 179 A.3d 1161, 1164 n.2 (Pa. Cmwlth. 2018). Preliminary objections in the nature of a demurrer should only be sustained if the law says with certainty that no recovery is possible. *Foster v.*

---

[11] 42 Pa. C.S. §§ 7531-7541.

*Peat Marwick Main & Co.*, 587 A.2d 382, 384 (Pa. Cmwlth. 1991), *aff'd sub nom. Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 676 A.2d 652 (Pa. 1996). Where a preliminary objection presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *Russo v. Allegheny Cty.*, 125 A.3d 113, 116 n.5 (Pa. Cmwlth. 2015), *aff'd*, 150 a.3d 16 (Pa. 2016); *see Office of Governor v. Donahue*, 98 A.3d 1223, 1228 (Pa. 2014) ("The issue of standing is a question of law; thus, our standard of review is *de novo* and our scope of review is plenary.").

## A. Standing

We begin by addressing the question of standing. The general rule is that a party seeking redress from the courts must establish standing to bring and maintain the action. *Pittsburgh Palisades Park, LLC v. Cmwlth.*, 888 A.2d 655, 659 (Pa. 2005). In Pennsylvania, this standing doctrine "is a prudential, judicially[ ]created tool meant to winnow out those matters in which the litigants have no direct interest." *In re Hickson*, 821 A.2d at 1243. "The purpose of . . . standing is to protect against improper plaintiffs." *In re Application of Biester*, 409 A.2d 848, 851 (Pa. 1979).

As part of our standing analysis in this case, we also recognize the remedial nature of the Declaratory Judgments Act, as it provides: "This subchapter is declared to be remedial. Its purpose is to settle and to *afford relief from uncertainty and insecurity* with respect to rights, status, and other legal relations, *and is to be liberally construed and administered*." 42 Pa. C.S. § 7541(a) (emphasis added). We further note that the General Assembly expressly abolished the principle that declaratory judgment actions must give way to other existing avenues of relief:

> The General Assembly finds and determines that the principle rendering declaratory relief unavailable in circumstances where an action at law or in equity or a special statutory remedy is available has unreasonably

8

> limited the availability of declaratory relief and such principle is hereby abolished. The availability of declaratory relief shall not be limited by the provisions of 1 Pa. C.S. § 1504 (relating to statutory remedy preferred over common law) and the remedy provided by this subchapter shall be additional and cumulative to all other available remedies except as provided in subsection (c). Where another remedy is available the election of the declaratory judgment remedy rather than another available remedy shall not affect the substantive rights of the parties, and the court may pursuant to general rules change venue, require additional pleadings, fix the order of discovery and proof, and take such other action as may be required in the interest of justice.

*Id.* § 7541(b).

Here, Appellants assert standing to challenge the ordinances under a traditional standing analysis and as taxpayers. In their brief on appeal, the City Defendants also contend that FOAC lacks the legal capacity to bring this action, based on its status as a political action committee, or PAC.

### 1. *Traditional Standing*

Under a traditional standing analysis, the individual initiating the legal action must show that he is aggrieved by the matter that he seeks to challenge. *Pittsburgh Palisades*, 888 A.2d at 659-60. To be aggrieved, the party must have a substantial, direct, and immediate interest in the outcome of the litigation:

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (en banc) (citations omitted).

9

We will analyze first the standing of First, Bullock, and Stolfer (collectively, Individual Plaintiffs).[12] The Individual Plaintiffs are named plaintiffs only with respect to the legal challenges to the Discharge, Lost/Stolen, State of Emergency, and Park Ordinances. First is an adult resident of the City. He lawfully possesses firearms under state and federal law. He is a member of FOAC. As a gun owner and City resident, First fears prosecution under the ordinances, particularly because the City has indicated that it has enforced and will continue to enforce the ordinances. Bullock is not a resident of the City. He does, however, commute daily to Harrisburg for work. Like First, he lawfully possesses firearms under state and federal law and is a member of FOAC. He, too, fears prosecution under the ordinances. Stolfer is a member and the President of FOAC. He lawfully possesses firearms under state and federal law. Although he does not reside in the City, he regularly travels "on an average bi-weekly basis" to the City for political activities, both as the President of FOAC and in his individual capacity. Like First and Bullock, Stolfer fears prosecution under the ordinances. In addition to the foregoing, the Individual Plaintiffs each own, possess, use, and bear firearms for purposes of self-defense, hunting, firearms training and education, and target shooting. They are licensed to carry concealed firearms throughout the Commonwealth.

The City enacted, enforced, and continues to enforce the challenged ordinances. Indeed, both Mayor Papenfuse and Chief Carter have, through the media, publicly expressed their support for the ordinances and ongoing enforcement thereof. Appellants observe that any violation of the challenged ordinances could

---

[12] For purposes of our analysis, because the trial court sustained the City Defendants' standing challenge as a demurrer, we accept as true all well-pleaded allegations of material fact contained in the Complaint, as well as any reasonable inferences therefrom. *Pa. Indep. Oil & Gas Ass'n v. Cmwlth.*, 135 A.3d 1118, 1123 (Pa. Cmwlth. 2015) (en banc).

10

lead to the filing of criminal charges, prosecution, and penalties. The current, actual, and threatened enforcement of the challenged ordinances has a chilling effect on the Individual Plaintiffs' rights to engage in constitutionally protected activities with respect to firearms. Indeed, the Individual Plaintiffs fear criminal prosecution under the challenged ordinances if they choose to engage in what they view as their constitutionally protected right to bear arms, concealed or open.[13]

Relying on the above factual averments, Appellants contend that the Individual Plaintiffs satisfy the traditional standing test. Appellants also argue that because they are challenging the validity of an ordinance, the law does not require them to trigger enforcement before bringing the challenge. In response, the City Defendants largely focus on the third test for traditional standing—*i.e.*, that the asserted interest be "immediate," not "remote or speculative." The City Defendants note first that the challenged ordinances are not new. According to the City Defendants,[14] the Discharge Ordinance dates back to 1821. The City passed the Park Ordinance in 1905, the Minors Ordinance in 1951, the State of Emergency

---

[13] With respect to First's standing and Appellants' argument in support of taxpayer standing, Appellants rely on additional factual claims in their brief on appeal not included in their Complaint. Specifically, Appellants claim that First "lived through the states of emergency declared in Harrisburg in 2011 and 2016." (Appellants' Br. at 16.) Appellants also allege that the City must satisfy a $250,000 deductible before insurance will cover its litigation costs with respect to defending the challenged ordinances. (*Id.* at 21.) As we are here reviewing the propriety of the trial court's grant of a demurrer for lack of standing, we will not consider these additional allegations of fact. Instead, we confine our analysis to the averments in the Complaint.

[14] City Defendants filed a supplemental reproduced record, which the City Defendants contend support the legislative history that they recount in their brief on appeal. As we do not find the legislative history dispositive, we have not endeavored to verify the above dates. Instead, we simply accept them solely for purposes of setting forth City Defendants' argument on appeal.

11

Ordinance in 1969,[15] and the Lost/Stolen Ordinance in 2009.  Given the age of these ordinances and the fact that not one of the Individual Plaintiffs has been cited or threatened with citation under any of them, the City Defendants contend that the Individual Plaintiffs' fear of prosecution is pure speculation.

Further, citing this Court's decisions in *National Rifle Association v. City of Philadelphia*, 977 A.2d 78 (Pa. Cmwlth. 2009) (en banc), *appeal denied*, 996 A.2d 1069 (Pa. 2010) (*NRA/Philadelphia*), and *National Rifle Association v. City of Pittsburgh*, 999 A.2d 1256 (Pa. Cmwlth. 2010), *appeal denied*, 23 A.3d 543 (Pa. 2011) (*NRA/Pittsburgh*), the City Defendants argue that in order to have standing to challenge the ordinances, the Individual Plaintiffs must allege that they have actually violated the ordinances and/or have been prosecuted for doing so. Because the Individual Plaintiffs do not include such allegations in their Complaint, the City Defendants contend that they lack standing to challenge the ordinances. With respect to the Minors Ordinance, the City Defendants note that not a single named plaintiff is a minor, nor do Appellants plead that any minor has been cited under the ordinance or will violate the ordinance and be cited.  With respect to the State of Emergency Ordinance, the City Defendants argue that Appellants needed to plead that the ordinance is going to actually be triggered in the near future—*i.e.*, the Appellants needed to plead a prediction of "widespread civil unrest."  (City Defendants' Br. at 10.)  Moreover, Appellants do not plead that there ever has been

---

[15] The purported passage of the State of Emergency Ordinance in 1969 appears to coincide with a bloody and violent period of civil unrest in our nation's history.  In the immediately preceding year, civil rights icon and Nobel Peace Laureate Dr. Martin Luther King, Jr. and presidential candidate Senator Robert F. Kennedy were assassinated.  A wave of urban riots followed, fueled by a deep sense of fear and despair over racial and economic injustice as well as calls to end the United States' military involvement in the Vietnam War.

an emergency that triggered the gun restrictions set forth in the State of Emergency Ordinance.[16]

In reply, Appellants advocate a relaxed traditional standing inquiry, given that they are pursuing relief under the Declaratory Judgments Act. Whether under this relaxed inquiry or a traditional standing inquiry, however, Appellants argue that they have averred sufficient facts to proceed with their challenges. Moreover, citing, *inter alia*, the Pennsylvania Supreme Court's decision in *Arsenal Coal Co. v. Department of Environmental Resources*, 477 A.2d 1333 (Pa. 1984), Appellants argue that their avenues to challenge the validity of the ordinances should not be limited to summary criminal enforcement proceedings. Rather, Appellants seek pre-enforcement review under the Declaratory Judgments Act.

As noted above, standing is a tool to protect against improper plaintiffs. An improper plaintiff is one "who is not adversely affected *in any way* by the matter he seeks to challenge." *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280 (Pa. 1975) (emphasis added). With respect to the Discharge Ordinance and Park Ordinance, based on the allegations set forth in the Complaint, we find that the Individual Plaintiffs each have a substantial interest in the legality of these ordinances. Each is a lawful gun owner who lives in, works in, or regularly visits the City. Accordingly, these challenged ordinances restrict, to varying degrees, the Individual Plaintiffs' lawful use/possession of their firearms while in

---

[16] At various points in their brief in opposition, the City Defendants argue that various state laws or court decisions cut against Appellants' legal challenges to the ordinances. In essence, the City Defendants contend that because Appellants cannot prevail on the merits, they do not have standing. The question of standing, however, does not focus on the legal merits of the asserted claims. Whether Appellants may ultimately prevail on their legal challenges to the ordinances is not a question that is presently before us.

the City. The Individual Plaintiffs, therefore, have an interest in the legality of these ordinances that surpasses the common interest of all citizens.

The Individual Plaintiffs' interest is direct, because there is a causal connection between the Individual Plaintiffs' possession and use of firearms and the City's decision to restrict that activity through the passage and enforcement of these ordinances. Finally, the interest is immediate because the Individual Plaintiffs cannot now discharge a firearm within much of the City without violating the Discharge Ordinance, nor can they now carry or discharge a firearm within a City park without violating the Park Ordinance. Moreover, according to the allegations in the Complaint, the City is actively enforcing these ordinances and has so advised the public through the media. The Individual Plaintiffs are proper plaintiffs to challenge the legality of those ordinances because they are currently adversely affected by the existence and enforcement of the Discharge Ordinance and Park Ordinance. FOAC, concomitantly, has standing to challenge these ordinances. *See Robinson Twp., Washington Cty. v. Cmwlth.*, 83 A.3d 901, 922 (Pa. 2013) ("Under Pennsylvania law, an association has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged."); *Americans for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 533 (Pa. Cmwlth. 2016).

We reach the same conclusion with respect to the Lost/Stolen Ordinance. The Lost/Stolen Ordinance imposes an obligation on the Individual Plaintiffs, as lawful gun owners who live in, work in, or regularly visit the City, to report a lost/stolen firearm to local law enforcement within 48 hours of the loss or theft. The Individual Plaintiffs have an interest in the legality of the Lost/Stolen

14

Ordinance that surpasses the common interest of all citizens, because the Individual Plaintiffs fall within the class of individuals on whom the ordinance imposes a duty to report.[17]

The Individual Plaintiffs' interest is direct, because there is a causal connection between the Individual Plaintiffs' possession and use of firearms and the City's decision to impose an affirmative reporting obligation on those who chose to do so should they lose their firearm or have their firearm stolen. Finally, the interest is immediate. Although the reporting obligation is triggered only in the event a firearm is lost or stolen, the reporting obligation nonetheless exists now. The relatively recent passage of the ordinance itself in 2009 serves, at some level, as an acknowledgment by Harrisburg City Council that the loss or theft of firearms is an existing threat to public safety, justifying local legislative action. In the event of a lost or stolen firearm, the Individual Plaintiffs will have only 48 hours to comply. The harm that the Individual Plaintiffs wish to abate is the affirmative obligation to report lost/stolen firearms to local government officials as a result of their decision to own and carry firearms in the City. It is not speculative. It is not remote. Because the Individual Plaintiffs are presently adversely affected by the existence and enforcement of the Lost/Stolen Ordinance, they, and by extension FOAC, are proper plaintiffs to challenge the legality of that ordinance.

Finally, we must determine whether the Individual Plaintiffs have standing, under traditional standing principles, to challenge the State of Emergency Ordinance. Our analysis of the challenge to this ordinance yields a different result.

---

[17] Although Appellants suggest that the challenged ordinances can be enforced beyond the geographic boundaries of the City, they provide no legal citation that a third-class city, such as the City, has the authority, under its general police power or otherwise, to enact an ordinance of statewide application. Nor do they allege that the City's current or past enforcement of the ordinances extends beyond the city limits.

15

Unlike the other three ordinances discussed above, the State of Emergency Ordinance does not currently impose any duty on the Individual Plaintiffs or any restriction on their ability to use or possess firearms within the City. Its operative provisions only become effective if/when the Mayor declares a state of emergency, which the ordinance limits to the following extreme circumstance:

> Whenever the Mayor determines *there has been an act of violence or a flagrant and substantial defiance of or resistance to a lawful exercise of public authority* and that, therefore, there *is reason to believe that there exists a clear and present dange*r of a riot, civil disorder or other general public disorder, widespread disobedience of the law and substantial injury to persons or property, all of which constitute a threat to public peace or order and to the general welfare of the City or a part or parts thereof, he or she may declare that a state of emergency exists within the City or any part or parts thereof.

Code § 3-355.1 (emphasis added).[18]  While, for reasons set forth above, the Individual Plaintiffs' status as current lawful gun owners evidences an interest in the

---

[18] In their brief on appeal, Appellants contend, with embedded links to news articles published on www.pennlive.com, that Mayor Linda Thompson, on September 7, 2011, and Mayor Papenfuse, on January 23, 2016, declared states of emergency that triggered the State of Emergency Ordinance. (Appellants' Br. at 58-59.) As a resident of the City, First lived through those declarations. Citing these two instances, Appellants suggest that because First's rights were previously curtailed under the State of Emergency Ordinance, we should hold that they now have, or at least First now has, standing to challenge the ordinance. Even if we were to consider these allegations about past states of emergency in the City, which appear for the first time in Appellants' answer to City Defendants' Preliminary Objections (R.R. 194a), as if set forth in Complaint, they do not alter our reasoning or conclusion above. As the City Defendants note in their response brief (City Defendants' Br. at 11), again with embedded links to the relevant news articles, not all emergency declarations are alike. Mayor Thompson declared a state of emergency in 2011 in anticipation of the Susquehanna River rising above flood stage and flooding the City. Mayor Papenfuse declared a disaster emergency after 14 to 16 inches of snow fell overnight in the City, allowing the City to tap additional resources, like equipment and personnel, to combat the severe weather. The mayors issued these declarations in response to acts of God, not "an act of violence or a flagrant and substantial defiance of or resistance to a lawful exercise of public authority." Code § 3-355.1.A. In short, Appellants fail to allege anything in their Complaint, their answer to

16

legality of the State of Emergency Ordinance, at least as it affects firearm ownership, that surpasses that of the general public, Appellants fail to allege any facts in their Complaint under which we can conclude that this particular ordinance directly and immediately affects, regulates, or impairs the Individual Plaintiffs' possession, use, or enjoyment of their firearms. *See Gulnac by Gulnac v. S. Butler Cty. Sch. Dist.*, 587 A.2d 699, 701 (Pa. 1991) ("A declaratory judgment must not be employed to determine rights in anticipation of events which may never occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic."). For that reason, we agree with the trial court that the Individual Plaintiffs and FOAC lack standing to challenge the legality of the State of Emergency Ordinance.

The only named plaintiff with respect to the challenges to the Minor Ordinance is FOAC. According to the Complaint, FOAC is a statewide, nonpartisan political action committee and membership organization. It boasts 1,649 members. FOAC's mission is to defend, preserve, and protect constitutional and statutory rights to firearm ownership. FOAC was formed in 1993 but became a statewide political action committee in 1994. FOAC's membership includes those who lawfully possess firearms throughout the Commonwealth, including Dauphin County. With respect to the Minors Ordinance specifically, FOAC currently has members under the age of 18, one of whom lives in the City and is subject to the ordinance.

---

the Preliminary Objections, or their briefs on appeal that would cause us to believe that Individual Plaintiffs' rights as lawful gun owners have ever been impacted or are likely to be impacted by the State of Emergency Ordinance, which, as noted above, is only triggered in extreme, hopefully rare, circumstances and specifically only in response to acts of violence or defiance of the law (not floods and snow storms).

In their brief, the City Defendants acknowledge the allegation in the Complaint that FOAC has a current member under the age of 18 who resides in the City. The City Defendants suggest, however, that the member may no longer be 18 and that FOAC should be required to show the current age of the member. In addition, the City Defendants argue that there is no allegation in the Complaint that the minor member of FOAC has been cited under the ordinance or will violate the ordinance and be cited in the future. In the absence of such allegations, the City Defendants ague that there can be no standing.

An association seeking standing is not required to disclose the identity of its affected member, but it must describe the affected member in sufficient detail to show that the member is aggrieved. *Americans for Fair Treatment, Inc.*, 150 A.3 at 534-35. FOAC alleges that it has at least one member who is under the age of 18 living in the City impacted directly by the ordinance's prohibition against unaccompanied minors possessing firearms. This member falls within the class of persons regulated by the Minors Ordinance and thus has an interest that surpasses that of the general public. The ordinance has a direct and immediate effect on the member, because the ordinance prohibits the member from possessing a firearm within the City unaccompanied by an adult. We, therefore, conclude, based on the allegations in the Complaint, that FOAC has associational standing to challenge the legality of the Minors Ordinance.

The City Defendants argue that FOAC lacks the capacity to bring this lawsuit. As a PAC, the City Defendants contend that FOAC is only authorized to spend funds on election-related expenses. Given that this lawsuit is not

18

election-related, the City Defendants argue that FOAC may not be a plaintiff.[19] With respect to FOAC, Appellants contend that the City Defendants fail to adequately develop their lack of capacity to sue argument, and, therefore, we should deem it waived. *See In re Tax Claim Bureau of Lehigh Cty. 2012 Judicial Tax Sale*, 107 A.3d 853, 857 n.5 (Pa. Cmwlth.) ("A party's failure to develop an issue in the argument section of its brief constitutes waiver of the issue."), *appeal denied*, 117 A.3d 299 (Pa. 2015).

The City Defendants' argument requires this Court to assume facts beyond those set forth in the Complaint or, for that matter, the City Defendants' Preliminary Objections.[20] Specifically, there is no allegation in the Complaint or the City Defendants' Preliminary Objections that FOAC is spending any money to support this litigation. Even if we assume that an Election Code violation justifies dismissal of a plaintiff for lack of capacity to sue, which the City Defendants suggest in only a cursory manner, we cannot necessarily conclude that FOAC is funding this litigation, lawfully or unlawfully, simply because it is one of several named plaintiffs. Moreover, we note that, in addition to identifying itself as a PAC, FOAC identifies itself as a "membership organization with 1,649 members." (Complaint ¶ 3.) Accordingly, based on what is, and is not, alleged in the Complaint and the

---

[19] In support for this proposition, the City Defendants cite to Section 1634.1 of the Election Code (Election Code), Act of June 3, 1937, P.L. 1333, *as amended*, added by the Act of November 26, 1978, P.L. 1313, 25 P.S. § 3254.1, which provides: "No candidate, chairman or treasurer of any political committee shall make or agree to make any expenditure or incur any liability except as provided in [S]ection 1621(d) [of the Election Code, added by the Act of October 4, 1978, P.L. 893, 25 P.S. § 3241]."

[20] *See* Pa. R.C.P. No. 1028(a)(5) note (noting that lack of capacity to sue preliminary objection cannot be determined from facts of record and must, therefore, be endorsed with a notice to plead).

Preliminary Objections, we reject the City Defendants' alternative lack of capacity to sue argument directed at FOAC.

We recognize that our decision here, affording traditional standing to Individual Plaintiffs and FOAC, conflicts with our precedent in *NRA/Pittsburgh* and *NRA/Philadelphia*, wherein this Court held that the plaintiffs in those cases lacked standing to challenge local gun ordinances because they failed to allege in their verified pleadings that they have actually violated the challenged ordinances, that they intend to violate the challenged ordinances, or that they have been prosecuted for violating the challenged ordinances. *See NRA/Pittsburgh*, 999 A.2d at 1258-59; *NRA/Philadelphia*, 977 A.2d at 82. The doctrine of *stare decisis*, however, "is not an inexorable command to be followed blindly when such adherence leads to perpetuating error." *Stilp v. Cmwlth.*, 905 A.2d 918, 967 (Pa. 2006); *see Buckwalter v. Borough of Phoenixville*, 985 A.2d 728, 731 (Pa. 2009).

After we decided *NRA/Pittsburgh*, the Pennsylvania Supreme Court issued its decision in *Robinson Township*. Among the issues the Supreme Court addressed in that case was whether this Court erred in dismissing the challenges of a physician to a state statute that restricted the physician's ability to obtain and share with other physicians information about chemicals used in unconventional drilling operations. We concluded that the physician would not have standing to challenge the statute unless and until (a) he actually requested the confidential information and his request was either denied or his access to the information restricted in such a way to prevent him from proving care to his patients, or (b) he actually possessed the information and wished to disclose it to others in violation of the statute's confidentiality provision. *Robinson Twp.*, 83 A.3d at 923. Otherwise, the

20

physician's asserted interest was too remote and speculative or, alternatively, not ripe for judicial review.

On appeal, the Supreme Court disagreed with our analysis and reversed, opining:

> [The physician] describes the untenable and objectionable position in which [the statute commonly known as] Act 13[21] places him: choosing between violating a Section 3222.1(b) [of Act 13] confidentiality agreement and violating his legal and ethical obligations to treat a patient by accepted standards, or not taking a case and refusing a patient medical care. The Commonwealth's attempt to redefine [the physician's] interests and minimize the actual harm asserted is unpersuasive. Our existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide medical services to a patient, is equally undesirable.
>
> In light of [the physician's] unpalatable professional choices in the wake of Act 13, the interest he asserts is substantial and direct. Moreover, [the physician's] interest is not remote. A decision in this matter may well affect whether [the physician], and other medical professionals similarly situated, will accept patients and may affect subsequent medical decisions in treating patients—events which may occur well before the doctor is in a position to request information regarding the chemical composition of fracking fluid from a particular Marcellus Shale industrial operation. Additional factual development that would result from awaiting an actual request for information on behalf of a patient is not likely to shed more light upon the constitutional question of law presented by what is essentially a facial challenge to Section 3222.1(b).

*Robinson Twp.*, 83 A.3d at 924-25 (citations omitted) (citing *Cozen O'Connor v. City of Phila. Bd. of Ethics*, 13 A.3d 464 (Pa. 2011) (holding law firm had standing

---

[21] 58 Pa. C.S. §§ 2301-3504.

to pursue declaratory judgment to determine whether it could forgive outstanding debt owed to it by political campaign committee without violating Philadelphia campaign contribution laws); *Shaulis v. Pa. State Ethics Comm'n*, 833 A.2d 123 (Pa. 2003) (holding attorney had standing to pursue judicial review of advisory opinion of Pennsylvania State Ethics Commission to determine whether she was statutorily barred from publishing articles or books on Pennsylvania state taxes during first year after her retirement), *abrogated in part on other grounds by Yocum v. Pa. Gaming Control Bd.*, 161 A.3d 228 (Pa. 2017); *Arsenal Coal*, 477 A.2d 1333 (holding coal company had standing to pursue action to enjoin Department of Environmental Resources from implementing certain regulations)).

Appellants, who believe that the challenged ordinances are facially invalid restrictions on rights afforded them under the United States and Pennsylvania Constitutions, have no real alternative avenue to address their grievance. They can curb their conduct to conform to the ordinances' mandates or they can willfully violate the law and face criminal prosecution. Like the physician in *Robinson Township*, the law firm in *Cozen O'Connor*, the attorney in *Shaulis*, and the coal company in *Arsenal Coal*, Appellants face equally unappealing options. As the dissent in *NRA/Pittsburgh* explained:

> This Court's adoption by reference of the trial court's standing analysis in [*NRA/Philadelphia*] and its majority opinion in this case leave law-abiding citizens who fall within the class of those regulated by the allegedly unlawful ordinance with a Hobson's Choice— either comply with a law you believe is unlawful or subject yourself to possible criminal prosecution. We must not presume that the citizens of the Commonwealth will blithely choose to violate a law and risk criminal sanctions for the sole purpose of proving the law's invalidity any more than we should presume that a local government would enact a law, regulation, or ordinance that it has no

22

> intent to enforce. Accordingly, our ruling in [*NRA/Philadelphia*] and the majority opinion in this case create the avoidable risk that facially invalid criminal ordinances could go unchallenged if the burden of noncompliance and risk of prosecution is so great that willful noncompliance for the sole purpose of challenging the law is not an option.

*NRA/Pittsburgh*, 999 A.2d at 1261 (Brobson, J., dissenting).

Our precedent in *NRA/Pittsburgh* and *NRA/Philadelphia* is untenable and must be overruled because it affords greater access to the courts to challenge the facial constitutionality of ordinances to scofflaws than to law-abiding citizens. It makes little sense to wait for Appellants to break the law, which we presume they do not want to do, before they can challenge it. It also makes little sense to force law-abiding citizens to rely on law breakers to advocate their interests. "Additional factual development that would result from awaiting an actual" criminal proceeding enforcing these ordinances "is not likely to shed more light upon the . . . question of law presented by what is essentially a facial challenge" to the ordinances. *Robinson Twp.*, 83 A.3d at 925.

As explained above, the Minors Ordinance, the Discharge Ordinance, the Lost/Stolen Ordinance, and the Park Ordinance are local criminal ordinances that have a current impact on Appellants' interests, which are direct and substantial. Those interests are not remote. A decision in this matter will affect the extent to which Appellants may possess and use firearms within this City, as well as whether they have any obligation to comply with a 48-hour reporting requirement. A decision in this case will afford Appellants and the City Defendants "relief from uncertainty and insecurity with respect to rights . . . and other legal relations," a core and remedial purpose behind the Declaratory Judgments Act. 42 Pa. C.S. § 7541(a).

23

Pre-enforcement review of these ordinances is, therefore, appropriate, and Appellants are exactly who we would expect to bring such a challenge.

## 2. *Taxpayer Standing*

Where a plaintiff does not meet the traditional standing test, the circumstances of the challenge may warrant affording the plaintiff standing as a taxpayer. Under this relaxed standard for standing, the plaintiff must show the following: (1) the governmental action in question would otherwise go unchallenged; (2) those who are directly and immediately affected by the action complained of benefit from the action and thus are not inclined to challenge it; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other person is better suited to bring the challenge. *Phantom Fireworks*, 198 A.3d at 1216.[22] Even where these five criteria are satisfied, taxpayer standing is only appropriate in cases where the challenged action affects in some way the plaintiff's status *as a taxpayer*. *Americans for Fair Treatment, Inc.*, 150 A.3d at 537

---

[22] In their brief, Appellants cite the Pennsylvania Supreme Court's decision in *Price v. Philadelphia Parking Authority*, 221 A.2d 138 (Pa. 1966), for the proposition that any taxpayer may initiate an action to prevent the unlawful and wrongful expenditure of public funds. Since *Price*, however, the Pennsylvania Supreme Court has limited the applicability of taxpayer standing to those circumstances where the above criteria are met:

> The once liberal approach granting individuals standing based upon their interest as taxpayers was rejected by our Court in the seminal decision of [*In re*] *Application of Biester*, which reinvigorated the traditional requirements of standing that an individual must establish an interest in an action that surpasses the common interest of all taxpaying citizens. While [*In re Application of* ]*Biester* curtailed the concept of standing based solely upon taxpayer status, it also recognized that one who was not "aggrieved" so as to satisfy standing requirements might nevertheless be granted standing as a taxpayer if certain preconditions were met.

*Pittsburgh Palisades Park*, 888 A.2d at 661. Accordingly, we no longer consider *Price* to be controlling precedent on the question of taxpayer standing.

(citing *Upper Bucks Cty. Vocational-Tech. Sch. Educ. Ass'n v. Upper Bucks Cty. Vocational-Tech. Sch. Joint Comm.*, 474 A.2d 1120, 1122 (Pa. 1984)).

As noted above, Appellants, or a subset thereof, satisfy the test for traditional standing to challenge pre-enforcement the Minors Ordinance, the Discharge Ordinance, the Lost/Stolen Ordinance, and the Park Ordinance. Accordingly, it is unnecessary to assess whether Appellants also enjoy taxpayer standing to challenge these ordinances. We have also concluded that Appellants do not satisfy the traditional test for standing with respect to their challenges to the State of Emergency Ordinance. Accordingly, we must consider whether First, Bullock, and FOAC, on behalf of its members who pay taxes to the City (which would include First and Bullock), should be afforded taxpayer standing to challenge that ordinance.

Although Appellants contend that the City has expended and continues to expend public funds in the enforcement and prosecution of the challenged ordinances, there is no specific allegation in the Complaint that the City is incurring any expense in the prosecution and enforcement of the State of Emergency Ordinance. As noted above, that ordinance only becomes effective when the Mayor declares a state of emergency under certain extreme circumstances. Unlike the other ordinances, which are currently in effect and subject to active and ongoing policing and enforcement within the City, there is no allegation in the Complaint that the City can presently cite anyone for violating the State of Emergency Ordinance. The mere existence of the State of Emergency Ordinance, which imposes no stress on the City's coffers, poses no harm to First, Bullock, and FOAC's members *as taxpayers*. Taxpayer standing, therefore, is not an appropriate alternative basis to allow them to challenge the State of Emergency Ordinance.

25

**B. Immunity Defense**

As a matter of procedure, the affirmative defense of immunity should not be raised by preliminary objection but in an answer to the complaint under the heading "New Matter." Pa. R.C.P. Nos. 1028, 1030. Accordingly, Appellants are technically correct that the City Defendants improperly raised the defense of immunity in paragraph 48 of their Preliminary Objections.

Nonetheless, the trial court overruled Appellants' preliminary objection, seeking to strike that defense from the City Defendants' Preliminary Objections, citing this Court's decision in *Feldman v. Hoffman*, 107 A.3d 821 (Pa. Cmwlth. 2014), *appeal denied*, 121 A.3d 497 (Pa. 2015). In *Feldman*, we observed that, as a technical matter, the Pennsylvania Rules of Civil Procedure prohibit a defendant from raising the affirmative defense of immunity by way of preliminary objection. Should a plaintiff wish to contest the defense on this procedural ground, the plaintiff must file a preliminary objection to the preliminary objection. *Orange Stones v. City of Reading*, 87 A.3d 1014, 1022 (Pa. Cmwlth. 2014). Where, however, the asserted affirmative defense is clearly applicable on the face of the complaint, the court will consider it unless the plaintiff advances some reason, "other than prolonging the matter," to defer consideration. *Feldman*, 107 A.3d at 835.

In their preliminary objection to the City Defendants' Preliminary Objections, Appellants only raised the technical/procedural challenge to the City Defendants' inclusion of the immunity defense in their Preliminary Objections. Consistent with *Feldman*, the trial court appropriately overruled Appellants' preliminary objection. We stress, however, that the trial court has not yet ruled on the merits of the asserted immunity defense, ruling instead that Appellants lacked

standing and dismissing the Complaint on that basis. Whether the defense is "clearly applicable on the face of the [c]omplaint" remains an open question. *Feldman*, 107 A.3d at 835.

### III. CONCLUSION

For the reasons set forth above, we conclude that Appellants have standing to challenge the legality of the Discharge Ordinance, the Lost/Stolen Ordinance, and the Park Ordinance. We also conclude that FOAC has associational standing to challenge the legality of the Minors Ordinance. Appellants, however, do not have standing, under traditional standing principles or as taxpayers, to challenge the legality of the State of Emergency Ordinance. Accordingly, we will affirm in part and reverse in part the trial court's October 9, 2018 Order, dismissing the entirety of the Complaint for lack of standing. As the trial court did not err in overruling Appellants' preliminary objection to the City Defendants' Preliminary Objections, we will affirm the trial court's January 4, 2018 Order.

P. KEVIN BROBSON, Judge

Judge Covey did not participate in the decision of this case.

27

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Firearm Owners Against Crime; :
Kim Stolfer; Joshua First; and :
Howard Bullock, :
     Appellants :
        :
    v. : No. 1434 C.D. 2018
        :
City of Harrisburg :
Mayor Eric Papenfuse; and :
Police Chief Thomas Carter :

## **O R D E R**

AND NOW, this 12th day of September, 2019, the October 9, 2018 Order of the Dauphin County Court of Common Pleas (trial court), dismissing Appellants' Complaint for lack of standing, is AFFIRMED in part and REVERSED in part. The January 4, 2018 Order of the trial court, overruling Appellants' preliminary objection, is AFFIRMED.

          _____
          P. KEVIN BROBSON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Firearm Owners Against Crime; Kim : 
Stolfer; Joshua First; and Howard : 
Bullock, : 
              Appellants : 
               : No. 1434 C.D. 2018
            v. : 
               : Argued: April 10, 2019
City of Harrisburg Mayor Eric : 
Papenfuse; and Police Chief : 
Thomas Carter : 


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


CONCURRING/DISSENTING OPINION
BY JUDGE McCULLOUGH                FILED: September 12, 2019


        I agree with the Majority that Firearm Owners Against Crime (FOAC),

Kim Stolfer, Joshua First, and Howard Bullock (collectively, Appellants) have

standing to challenge the legality of four sections of the Codified Ordinances of the

City of Harrisburg (Code), to wit, Section 3-345.2 (Discharge Ordinance), Section

3-345.4 (Lost/Stolen Ordinance), and Section 10.301.13 (Park Ordinance). I also

agree that FOAC has associational standing to challenge Section 3-345.1 of the Code

(Minors Ordinance). I write separately, however, because I disagree with the

Majority's conclusion that Appellants lacked standing to challenge Section 3-355.2

of the Code prohibiting the sale or transfer of firearms and ammunition during a

period of emergency declaration by the Mayor of Harrisburg and authorizing the Mayor to prohibit the public possession of firearms during such a state of emergency (State of Emergency Ordinance).[1]

---

[1] In pertinent part, this Section states,

> A. Whenever the Mayor declares that a state of emergency exists, the following emergency prohibitions shall thereupon be in effect during the period of said emergency and throughout the City:
>
>> (1) The sale or transfer of possession, with or without consideration, the offering to sell or so transfer and the purchase of any ammunition, guns or other firearms of any size or description.
>>
>> (2) The displaying by or in any store or shop of any ammunition, guns or other firearms of any size or description.
>>
>> (3) The possession in a public place of a rifle or shotgun by a person, except a duly authorized law enforcement officer or person in military service acting in an official performance of his or her duty.
>
> B. The Mayor may order and promulgate all or any of the following emergency measures, in whole or in part, with such limitations and conditions as he or she may determine appropriate; any such emergency measures so ordered and promulgated shall thereupon be in effect during the period of said emergency and in the area or areas for which the emergency has been declared:
>
> . . .
>
>> (8) The prohibition of the possession in a public place or park of weapons, including but not limited to firearms, bows and arrows, air rifles, slingshots, knives, razors, blackjacks, billy clubs, or missiles of any kind.

Code, §3-355.2.

"[W]here a trial court sustains preliminary objections on the merits, it is generally an abuse of discretion to dismiss a complaint without leave to amend." *Jones v. City of Philadelphia*, 893 A.2d 837, 846 (Pa. Cmwlth. 2006) (internal quotation marks omitted). "The right to amend should not be withheld where there is some reasonable possibility that amendment can be accomplished successfully." *Otto v. American Mutual Insurance Co.*, 393 A.2d 450, 451 (Pa. 1978).

Here, the City of Harrisburg, Mayor Eric Papenfuse, and Police Chief Thomas Carter (collectively, City Defendants) filed preliminary objections and, regarding the State of Emergency Ordinance, argued that Appellants lacked standing because they did not plead an imminent emergency would occur, which, according to the City Defendants, is necessary to trigger the provisions. In their response to the preliminary objections, Appellants asserted that Plaintiffs First, Bollock, and Stolfer have been subject to the provisions of the State of Emergency Ordinance. In particular, Appellants assert that Plaintiff First, as a Harrisburg resident, has lived through two states of emergency, one declared in 2011 and one declared during the pendency of this case in January 2016, which triggered the non-discretionary prohibitions in Section (A) of the State of Emergency Ordinance. (Reproduced Record (R.R.) at 2, 44.)[2] Crucially, Appellants sought the right to file an amended complaint. *Id.* at 47. They also noted that the City Defendants are actively enforcing

---

[2] Appellants observed that the State of Emergency Ordinance has two sections. Unlike Section 3-355.2(B), Section 3-355.2(A) of the Code, which in relevant part states, "Whenever the Mayor declares that a state of emergency exists, the following emergency prohibitions **shall** thereupon be in effect," makes the applicable restrictions effective immediately upon the declaration of a state of emergency by the Mayor. Code, §3-355.2(A) (emphasis added). Therefore, the prohibition on "possession in a public place of a rifle or shotgun by a person, except a duly authorized law enforcement officer or person in military service acting in an official performance of his duty," amongst others listed in Section 3-355.2(A), applied to Appellants for the duration of the state of emergency declared in January 2016. Code, §3-355.2(A)(3).

these Ordinances, including the State of Emergency Ordinance, which provides Appellants with standing to seek equitable relief in the form of a declaration and an injunction.

The Majority holds that Appellants lack standing to challenge the legality of this Ordinance because they failed "to allege any facts in their [c]omplaint under which we can conclude that this particular [O]rdinance directly and immediately affects, regulates, or impairs the Individual Plaintiffs' possession, use or enjoyment of their firearms." Majority Op. at 16. Notably, however, Appellants have alleged that they were subject to this Ordinance's restrictions during the pendency of this suit and they seek the ability to amend their complaint to include these facts. Because the right to amend must not be withheld where there is some possibility that amendment can be accomplished successfully, *Otto*, 393 A.2d at 451, Appellants must be permitted to do so here. Given the facts Appellants have alleged in their response, if permitted to include them in an amended complaint, I believe they would sufficiently demonstrate standing to challenge this Ordinance.

Furthermore, the Majority's salient point that Appellants possess standing with regard to the other sections of the Code because the "'[a]dditional factual development that would result from awaiting an actual' criminal proceeding enforcing these [O]rdinances 'is not likely to shed more light upon the . . . question of law presented . . . to the [O]rdinances'" applies equally to the State of Emergency Ordinance. Majority Op. at 23 (quoting *Robinson Township, Washington County v. Cmwlth.*, 83 A.3d 901, 999 (Pa. 2013)). Appellants are presented with an equally untenable choice with regards to this Ordinance as the Majority acknowledges Appellants are faced with in regards to the other Ordinances: "They can curb their conduct to conform to the [O]rdinance['s] mandates or they can willfully violate the

law and face criminal prosecution." Majority Op. at 22. I disagree that Appellants should be forced to wait until another state of emergency is declared until they are deemed to have standing to challenge the State of Emergency Ordinance, particularly where they allege that they have been subject to its parameters during the pendency of this very suit.

Finally, but not insignificantly, as the Supreme Court of the United States observed in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that whatever the Second Amendment might protect more broadly, "it surely elevates above all other interests the **right of law-abiding, responsible citizens** to use arms in defense of hearth and home." *Id.* at 635 (emphasis added).[3] "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . individual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) (quoting *Heller*, 554 U.S. at 599). In *McDonald,* the Court cautioned against treating the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 561 U.S. at 780. "[T]he text of the Amendment, as interpreted by *Heller* and *McDonald*, points toward the conclusion that 'bear' implies a right to carry firearms publicly for self-defense." *Young v. Hawaii*, 896 F.3d 1044, 105. (9th Cir. 2018). "Once identified as an individual right focused on self-defense, the right to bear arms must guarantee some right to self-defense in public" and the courts "are satisfied that the Second Amendment

---

[3] However, as the Supreme Court noted in *Heller*, "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as school and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27.

encompasses a right to carry a firearm openly in public for self-defense." *Id.* at 1068; *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 936-37 (7th Cir. 2012).[4]

As alleged in the Petition for Review, self-defense is most certainly implicated in the event of a declaration of a state of emergency by the Mayor of Harrisburg. *Id.* at 599 (emphasis added). According to City Defendants, in order for the Mayor to declare a state of emergency, there must be "'violence or a flagrant and substantial defiance of or resistance to a lawful exercise of public authority' [which] creates 'clear and present danger of a riot, civil disorder or other general public disorder, widespread disobedience of the law and substantial injury to persons or property . . . .'" (City Defendants' Br. at 11) (quoting Code, §3-355). As *Heller* made clear, it is *precisely* during such times that the protections afforded by the Second Amendment are the most critical.[5] To require Appellants to wait until

---

[4] Further, the Ordinance prohibits the sale or transfer of possession of ammunition and firearms in a state of emergency, yet the Courts have held that the core Second Amendment right to keep and bear arms for self-defense would be meaningless "without the ability to acquire arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *see id.* at 678 (quoting cases) ("The right to keep arms, necessarily involves the right to purchase them"); ("[T]he right to keep and bear arms for self-defense under the Second Amendment ... must also include the right to acquire a firearm"). And, although the Second Amendment "does not explicitly protect ammunition ..., without bullets, the right to bear arms would be meaningless." *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

[5] To me, footnote 15 of the Majority's opinion only serves to underscore the inescapable conclusion that under *Heller*, Appellants possess standing to challenge the State of Emergency Ordinance, which is applicable only in times of civil unrest, in order to vindicate their core Second Amendment right to bear arms in self-defense when the need to do so is at its zenith. No one doubts the need to address these times, but we cannot deny the Appellants the right to challenge the manner in which their constitutional rights might be abridged.

Quite simply, the question before us is whether Appellants have standing. We are not determining the validity of the Ordinance, yet this appears to be the thrust of the Majority's footnote 15, which unfortunately is not based on facts in the record before us.

another state of emergency occurs to grant standing, where they allege to have already been impacted by the Ordinance, is untenable.  For these reasons, I would grant standing to Appellants to also challenge section 3-335.2 of the Code.

_____
PATRICIA A. McCULLOUGH, Judge